## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## ROBIN AMERICAN CORPORATION, Respondent.

### No. 79–4064.

United States Court of Appeals, Fifth Circuit. Unit B

Aug. 31, 1981.

---

Elliott Moore, Deputy Assoc. Gen. Counsel, David S. Fishback, Atty., Washington D.C., for petitioner.

Muller, Mintz, Kornreich, Caldwell & Casey, Herbert B. Mintz, Miami, Fla., for respondent.

Before GODBOLD, Chief Judge, MORGAN and HENDERSON, Circuit Judges.

GODBOLD, Chief Judge:

The Board sues to enforce its order.[1] The major issues concern threats and interrogation, lay-offs and discharges, failure to reinstate unfair labor practice strikers, and validity of a *Gissel*[2] bargaining order.

Principals of a company not involved in this case purchased the zipper manufacturing department of the company in March 1977 and under the name Robin American ("RA") began producing zipper chain and the parts for the sliders that open and close zippers.[3] Of the three principals Robinson became president of the company, Benbasat vice president for manufacturing, and Samberg vice president for engineering. RA had several departments: coiling department, finishing department, sewing department, weaving department, slider department, shipping and receiving department.

Between November 5 and 10, 1977, 59 of approximately 86 to 88 non-clerical workers at RA's plant at Hialeah, Florida, signed union authorization cards.[4] The union demanded recognition, the request was refused, and in mid-November the union petitioned for a representation election.

### I. Interrogation and threats

The Board found that between November and mid-January managerial and supervisory employees engaged in a number of interrogations and threats to persons who had signed union cards. RA does not deny that these events occurred but merely argues that they were not coercive. The question is not even close. The evidence amply supports the tendency of the interrogations and threats to coerce.

### II. Closing of the slider department and discharge of employees

▮ All five employees in the slider department signed union cards. Three

---

1. The decision and order appear at 245 NLRB No. 108 (1979).

2. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

3. Zipper chain consists of two continuous woven tapes, each with "teeth" on one side. A slider is a mechanism applied to the tapes to engage or disengage the teeth, thus opening and closing the zipper.

4. The union is the International Ladies Garment Workers Union, ALF–CIO.

were subjected to interrogation or threats by management or supervisory employees. On December 9 without prior warning Samberg told these five employees that the department was being closed and all of them terminated. All except one had been working in the department since 1972 or 1973. RA had been manufacturing some of its slider requirements and purchasing others from suppliers. On closing the department it began purchasing all of its needs from suppliers.

As is true of several issues in this case, the question is sufficiency of the evidence. There was evidence both ways. The Board considered testimony that the slider department was—and was not—successful, that the costs of operating it were excessive, and that the sliders produced were—and were not—of acceptable quality. Portions of the evidence tending to show that the slider department was successful came from company witnesses, including vice president for engineering Samberg. The evidence that the department was closed and the employees discharged for anti-union motives was adequate to make out a prima facie case to support the inferences that protected conduct was a motivating factor in RA's decision. The burden shifted to the employer to demonstrate that the same action would have been taken in the absence of protected conduct. *Wright Line, a Division of Wright Line, Inc.*, 251 NLRB No. 150, 105 LRRM 1169 (1980). RA did not discharge this burden.

### III. Other lay-offs

#### (a) Oses and Ruiz

■ These two employees worked in the sewing department. Both had signed cards. In early January superintendent Quiros, who was in charge of the sewing department, told Oses not to think that the union was going to protect her from lay-off. On January 20, a Friday, Oses was told by Quiros that she was laid off. Union spokesman Luna intervened with Quiros, who said he had been ordered to lay off Oses. Luna accused Quiros of laying Oses off because she was a member of the union. Quiros

replied with an "affirmative gesture" and reiterated that he was following orders. Luna made the same accusation to Benbasat, who told him to "tell the union to stay in Coral Gables."[5] Oses had more seniority than sewing machine operators not laid off.

The next day, Saturday, Ruiz was laid off. On the Monday following, Luna asked Quiros about both of the lay-offs. Quiros responded that "the Company don't want the Union inside" and "if any people put the Union inside, I think he's not working in this Company."

RA contends that Oses and Ruiz were laid off because of a decline in sales and excessive inventory. According to Benbasat it was evident as early as September that RA was overproducing. But the lay-offs did not occur until four months later and two months after the union had come in and demanded recognition and approximately two weeks before the date of a scheduled election. Benbasat attempted to explain this discrepancy, but the Board was not required to accept his explanation.

The evidence adequately supports that Oses and Ruiz were laid off because of their union membership and not for economic reasons.

#### (b) Izquierdo

■ This employee, a sister-in-law of Octavio Rodriguez, the prime union supporter, worked in the finishing department. She had signed a union card and solicited three others. On January 20 she was told she was being laid off. This was done in the presence of her brother-in-law, Rodriguez. Rodriguez protested the discharge but without success. The company explains that it laid off Izquierdo because arrangements it had made with an outside firm to perform some manufacturing functions eliminated the need for her job. But immediately after Izquierdo was laid off the company replaced her with a worker from another department, who, however, had more seniority. Soon after the lay-off Arroyo, a junior employee in the finishing department, quit.

---

5. Some of RA's operations were in Coral Gables. The sewing department was at Hialeah.

Although Arroyo's job was difficult and Izquierdo had previously performed it, Izquierdo was not recalled to fill the vacancy.

We agree with the company that there is not substantial evidence that it had knowledge of Izquierdo's union activity. Izquierdo's situation is different from that of Oses and Ruiz. No statements were made at the time of her lay-off that tended to show company knowledge of her union activities or anti-union bias. When Rodriguez accused Ballarino of laying off Izquierdo because she was his sister-in-law and was a union member Ballarino merely responded that he was carrying out orders. Rodriguez repeated his accusation to Benbasat, who only said "this is my decision." Izquierdo was not one of the persons found by the Board to be leaders of the organizational campaign. The Board made general findings that since the plant was small and relationships were informal and friendly it was likely that everybody knew what was going on. To infer knowledge the Board also relies upon the evidence that Ballarino and Benbasat did not deny they laid off Izquierdo for union activities when accused of having done so. These failures to deny their motives, the locale of a small and informal plant, plus the in-law relationship with Rodriguez, are not substantial evidence on which to base an inference that the company knew Izquierdo was a union supporter.

### IV. The strike

The strike began January 24. The preceding day 40 to 50 employees met at the union hall. The Board found that the employees were upset by the recent discharges and lay-offs,[6] they were concerned that there would be more lay-offs, and they feared that the union would lose its support before the election. The union attempted to dissuade the employees from striking before the election, but some of them went out on strike the next day. On January 25 another meeting was held at which union officers told the employees that if they really believed that the company would "throw everybody out" the union would support the strike. The employees then voted unanimously to strike.

■ The foregoing findings, plus the recent lay-offs and discharges, the closing of a department, and the threats and interrogations adequately support the finding of the Board that the strike was an unfair labor practice strike and not a demand for recognition. Therefore, RA's refusal to grant reinstatements was a violation of the Act.

■ On January 27 Vice President Benbasat personally delivered pay checks to employees including strikers. Of the 40 employees on strike he asked 20 selected strikers, by a question to each employee, whether he wished to return to work. Eight accepted the invitation soon thereafter. The Board found that this solicitation to abandon the strike and return to work violated § 8(a)(1) because it was an attempt to deal with the individual employees in disregard of the right of the employees to bargain through a chosen collective bargaining agent. There was no evidence of threats or promises of benefits made in connection with the solicitation, but this is not necessary since the rationale of this particular unfair practice is interference with the collective bargaining process. *NLRB v. Montgomery Ward & Co.*, 133 F.2d 676, 681–82 (9th Cir. 1943); *NLRB v. Wooster Division of Borg-Warner Corp.*, 236 F.2d 898, 905 (6th Cir. 1956), *rev'd on other grounds*, 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958). *General Electric Co. v. NLRB*, 400 F.2d 713, 720 (5th Cir. 1968), cert. denied, 394 U.S. 904, 89 S.Ct. 1012, 22 L.Ed.2d 216 (1969), is relied upon by the company as authority that soliciting employees not to strike is lawful. In that case, however, we explicitly recognized that solicitation of striking employees to return to work may be unlawful but distinguished the facts before us because there the employer was not guilty of over-all illegal opposition to the union, there was no unfair labor practice strike, and the employer recognized and bargained with the union.

**6.** Oses and Ruiz and Izquierdo had been discharged/laid off only two or three days earlier.

The election was set for March 3. On February 15 the union notified RA that the 32 employees still on strike wanted to return. The company did not respond to the request for reinstatement until after the election. In the election there were 40 votes against the union, 14 in favor, and 30 challenged ballots. Of the 30 challenged, 27 were cast by strikers or alleged discriminatees. Three days after the election the company offered reinstatement to two employees, stating that 13 had been permanently replaced, three were ineligible, and the rest were not needed and had no expectation of early recall.

■ Unfair labor practice strikers are entitled to reinstatement on request even if they have been replaced. *Mastro Plastics Corp. v. NLRB* 350 U.S. 270, 278, 76 S.Ct. 349, 355, 100 L.Ed. 309 (1956). The company refused to reinstate Octavio Rodriguez and Martin Santiago on the ground they were supervisors and therefore not protected by the Act and subject to discharge for striking. In part V, below, we reject the argument that they were supervisors. They were, therefore, entitled to reinstatement.

The company argues that it was not required to reinstate strikers when they offered to return to work because no jobs were then available. It was not until March 6, three days after the election and 21 days after the offer to return, that the company responded to the strikers' offer. The company hired 10 to 12 replacements for strikers, and it did not begin to lay them off until early March. It is, therefore, clear that the company committed an unfair labor practice by refusing reinstatement for three weeks and until after the election.[7]

### V. The *Gissel* bargaining order

The Board issued a bargaining order based on both prongs of *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). It found "outrageous" and "pervasive" unfair labor practices had been committed and a bargaining order was the only available and effective remedy (Type I *Gissel* order). Also it found that the union had enjoyed a majority status, that the company had committed serious unfair labor practice that had undermined the union, and it was highly improbable that in the near future the employees could freely exercise their preference in an election (Type II *Gissel* order).

■ RA contends the card count was tainted because a substantial number of cards were solicited by Martin Santiago and Octavio Rodriguez who, it contends, were supervisors. Before the change in ownership there were three supervisors in the plant: plant superintendent Ballarino and salaried supervisors Rodriguez and Santiago. After the change in ownership Benbasat called Rodriguez in and told him that there would be no more supervisors, that the only supervisor recognized would be [plant superintendent] Ballarino. Rodriguez was switched from salary to hourly wages and began to punch in on the time clock. He lost several benefits but was promised overtime work so his pay would equal his previous salary. Rodriguez was a leader in the organization campaign and solicited 18 cards. He was interrogated about the union. The Board recognized that Rodriguez was the most senior and most qualified employee in his department. His hourly wage was, however, not the highest in the department. On adequate evidence the Board found that Rodriguez did not make hiring and firing decisions but merely made casual suggestions, in the same way other employees did, of persons available for hire, and these suggestions were often not accepted by Benbasat, who made the actual hiring decision; that Rodriguez did not effectively recommend promotions or wage increases; that he did not supervise overtime work, though he initialed time cards of employees who did work overtime (several other non-supervisory employees could initial time cards). In the absence of the department head Rodri-

---

7. Also, when the company did respond it refused to reinstate two employees on the ground they were guilty of strike misconduct. No evidence was offered at the hearing to support this claim.

guez was notified by employees leaving early, but he had no authority to, nor did he, approve employees leaving early. Rodriguez performed a number of manual routine tasks, such as cleaning ovens, unloading boxes, moving material by hand trucks, and operating a fork lift.

Santiago's situation was generally parallel to that of Rodriguez. He had been supervisor of the weaving department. When RA took over, Benbasat told Santiago that Ballarino would be the only supervisor, that Santiago was to be transferred to a mechanic, and that under the law a supervisor could not repair a machine. He was changed from salary to hourly wage. Thereafter Santiago spent 90 per cent of his time repairing machines. He had no substantial connection with hiring.

Several months after the change in ownership Quiros was hired to supervise the coiling and sewing departments, and Ballarino retained supervision of other departments.

The Board correctly found that Rodriguez and Santiago were not supervisors. *See NLRB v. Security Guard Service, Inc.*, 384 F.2d 143 (5th Cir. 1967). The card count was, therefore, not tainted.

██ The unlawful threats and interrogations, the discharges/lay-offs, the abolition of the slider department, the selective requests to employees to return to work, the offer of reinstatement to only two of the 32 strikers remaining out after eight of those solicited to return did return, all of which we have found supported by sufficient evidence, occurring within a short span of time and in a small shop where relationships were close, meet the requirements for a Type I order.

██ The company questions whether the Board has made the four findings required for Type II *Gissel* orders by *NLRB v. American Cable System, Inc.*, 414 F.2d 661, 668–69 (5th Cir. 1969), cert. denied, 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed.2d 266 (1970), *discussed in Bandag, Inc. v. NLRB*, 583 F.2d 765, 770–73 (5th Cir. 1978). These criteria do not apply to a Type I *Gissel* order, which

may be entered when the employer has committed outrageous and pervasive unfair labor practices and a bargaining order is the only available effective remedy. The first of these two prerequisites is clearly met. And the Board was entitled to conclude that the second was met because of the nature and severity of the unfair labor practices committed over a brief period of time in a small plant where relationships were close. Moreover, a Type I *Gissel* order may issue though no card majority has been demonstrated. Here the union had a card majority before the company's unfair labor practice began. The rationale of *Gissel* seeks to protect the "values of free choice," *NLRB v. WKRG–TV, Inc.*, 470 F.2d 1302, 1320 (5th Cir. 1973). Here free choice was made and recorded before the company began its pattern of illegal conduct. When free choice is followed at once by pervasive and outrageous unfair practices "the card majority should not be subordinated to a potentially tainted election." *WKRG–TV, supra*, at 1320.

The Board order is ENFORCED except with respect to the discharge of Izquierdo.