628 A.2d 503

CANONSBURG GENERAL HOSPITAL, Petitioner,

v.

UNEMPLOYMENT COMPENSATION BOARD
OF REVIEW, Respondent.

Commonwealth Court of Pennsylvania.

Argued March 31, 1993.

Decided June 30, 1993.

534

Donald O. Connor and Kathy Speaker MacNett, for petitioner.

Maribeth Wilt–Seibert, Asst. Counsel, for respondent.

Ronald A. Berlin, for intervenors Antonia Vallone et al.

Frayda Kamber, Deputy Chief Counsel, for intervenor Dept. of Labor and Industry.

Before CRAIG, President Judge, and DOYLE, PALLADINO, McGINLEY, SMITH, PELLEGRINI and FRIEDMAN, JJ.

DOYLE, Judge.

■ This is an appeal by Canonsburg General Hospital (Employer) from an order of the Unemployment Compensation Board of Review (Board) which, *inter alia,* affirmed the determination of the referee to deny benefits to Antonia Vallone, a "lead Claimant" [1] for the weeks ending April 6, 1991 through June 1, 1991 but to grant benefits for the week ending June 8, 1991.

On appeal the Board made its own findings of fact. Claimant had been employed by Employer as a laboratory secretary and was a member of the relevant collective bargaining unit as

1. Antonia Vallone is not a token Claimant as counsel did not agree to her being so. When, however, the determination of the Bureau of Unemployment Compensation Benefits and Allowances was appealed to the referee, Employer requested a formal hearing, not 121 hearings. The referee issued one decision with an opinion and 120 separate orders, each with its own appeal number. Employer filed one mass appeal to the Board. The Board issued two decisions (due to a typographical error) and 119 orders. Each order had a separate Board number. Employer filed one appeal to this Court, not 121 appeals, and paid only one filing fee. Its conduct in taking only one appeal from multiple orders is in violation of Pa.R.A.P. 512. *McGuill v. Unemployment Compensation Board of Review,* 105 Pa.Commonwealth Ct. 222, 523 A.2d 1194 (1987). Employer, by its repeated failure to appeal each order separately, has acquiesced in the use of a lead claimant; accordingly, we will not hold, as Employer requests, that the Board's use of a lead Claimant was reversible error.

well as local union president. The existing collective bargaining agreement between Employer and District 1199 P, National Union of Hospital and Health Care Employees, SEIU, AFL–CIO, CLC (the Union) expired as of March 1, 1991 and as of that date no new agreement had been reached. However, work continued under the terms and conditions of the expired agreement with the exception of a one-day and a two-day work stoppage which are not at issue here. On April 4, 1991 the situation changed as is evidenced by the following findings made by the Board which, although extensive, are necessary to grasp for an understanding of this appeal:

9. At noon on April 4, 1991, the Union and 146 members of the bargaining unit initiated a work stoppage and established picket lines, which were thereafter maintained and continued to be maintained as of the date of the Referee's hearing on August 21, 1991.

10. As of noon on April 4, 1991, and continuing thereafter, work was available under the same terms and conditions of the expired Labor Management Agreement, while negotiations continued and the Union and its membership were aware of same.

. . . .

13. The Employer had made a decision to continue in operation if a work stoppage commenced and it did so after April 4, 1991, by utilizing the services of nurses and management employees, on an extended work schedule basis, and additionally, the Employer hired temporary employees.

14. All temporary replacement employees hired prior to May 29, 1991, were advised by the Employer that they were only being hired on a temporary basis to fill in for striking employees and, as such, they would not receive any of the fringe benefits received by regular employees and their services would be terminated when the striking employees returned to work.

15. Following negotiating sessions on May 20 and May 23, 1991, without a resolution of the dispute, the Employer on May 23, 1991, wrote to all striking bargaining unit employ-

ees and advised said employees of the Employer's latest offer, which had been rejected by the Union.

16. The letter of May 23, 1991, from the Employer to the Union members further advised the striking employees that even if its latest offer was not accepted by the Union that the striking employees could "return to work while we continue to negotiate."

17. Additionally, the letter of May 23, 1991, stated that "the hospital will begin to hire permanent replacements on Thursday, May 28, 1991, if a settlement has not been reached."

18. Following the May 23, 1991, letter, Employer instructed its department heads to call individual employees to tell them that Employer was hiring permanent replacements.

19. The Employer was in a position to begin hiring permanent replacements as it had numerous employment applications on file.

20. The Employer had also orally advised the Union negotiating team that if the striking employees did not return to work by May 28, 1991, they would be replaced with permanent replacements.

. . . .

22. On or about May 28, and May 29, 1991, the Employer began to hire permanent replacements and on or about May 29, 1991, fifty-two permanent replacements were hired and they were basically under the same terms and conditions that were contained in the Labor Management Agreement that had previously expired.

. . . .

24. Some of the persons who had been previously hired as temporary employees had their classification changed as of May 29, 1991, and May 30, 1991, to that of regular employees and they were now considered permanent replacements for striking employees.

25. Job assignments after April 4, 1991, varied from what they were prior thereto and, as such, the Employer was not actually replacing the striking employees on a name-for-

name or person-for-person basis but this fact was not communicated by the Employer to the Union or its membership.

26. In addition to hiring permanent replacements, the Employer also continued to hire temporary replacements on an as needed basis, and since June 13, 1991, and up to the date of the Referee's hearing, twenty such additional temporary employees were hired by the Employer.

27. The Employer on and after May 29, 1991, made public and private statements that the striking employees had been permanently replaced, had been fired, and had no jobs to go back to.

28. Several bargaining unit employees called the Employer after receiving the letter of May 23, 1991, and were advised that if they did not return to work they would be permanently replaced.

29. At all times after May 28, 1991, the Union and its membership understood based on the private and public pronouncements by the Employer, that all striking employees who had not returned to work by May 28, 1991, no longer had a job and had been or would be permanently replaced.

30. Union members involved in the work stoppage continued to accrue seniority, continued to have their names on a monthly birthday list, continued to have life insurance provided by Employer, and had the sick leave bank maintained.

31. Union members involved in the work stoppage did not continue to accrue vacation.

32. While Union members' seniority accrued during the work stoppage, this did not affect the hours of service involved in calculating their pensions.

33. The Employer never advised the Union or its membership that it had kept the striking workers' names in its computer so that their birthdays would be printed on the computer birthday list, nor did the Employer ever advise the Union or its membership that it continued to carry the

striking employees on the Employer's group life insurance plan.

34. Each permanent replacement that was hired by the Employer was required to sign a letter of understanding that a sixty-day probationary period was involved and that the employee could be separated, inter alia, in case of a settlement agreement with the Union or an order of the National Labor Relations Board providing for the replacement of striking employees.

35. The Union was aware of this letter given to the permanent replacements.

36. However, even after discussing the contents of same with Employer, the Employer continued to indicate to the Union that it was committed to the permanent replacements and the Union membership had given up rights to their jobs.

37. After the Employer did hire permanent replacements, negotiations continued between the Employer and the Union and a Federal Mediator became more active in the negotiating process.

38. The issue of the permanent replacements of the striking employees was a major issue with the Union and while the Union basically agreed with an Employer proposal of arbitration as contained in an Employer letter of June 28, 1991, the Union, as a pre-condition to any understanding or any arbitration wanted an agreement that the striking employees would return to their regular jobs, shifts, units, and hours of employment that they held on or before April 3, 1991, and further, that the employees be returned to their regular jobs no later than July 5, 1991.

39. The Employer would not agree to the Union's pre-conditions and, as a result, the parties did not agree to arbitration to bring the Labor Management dispute to an end.

40. A marathon negotiating session of some seventy-two hours duration was held on August 9, 1991, with a Federal Mediator in attendance, and when the Federal Mediator

recommended, inter alia, a return to work under the same terms and conditions of the Labor Management Agreement, with the economic issues being submitted to arbitration, the Union accepted all of the Federal Mediator's recommendations, but the Employer accepted some while accepting others with modification and, as a result, the dispute remained unresolved.

41. The Employer did, however, in its letter of August 16, 1991, responding to the Federal Mediator's proposal, express a willingness as a part of a total settlement to lay off the temporary and permanent replacements and to recall the striking employees to vacant positions based on their seniority.

42. The Labor dispute remained unresolved as of the date of the Referee's hearing on August 21, 1991.

The Board determined that because Section 402(d) of the Unemployment Compensation Law,[2] 43 P.S. § 802(d), provides that a claimant shall be ineligible for benefits for any week in which her unemployment is due to a stoppage of work which exists because of a labor dispute other than a lockout, Union members were ineligible for benefits for the weeks ending April 13 through June 1. The Board further reasoned, however, that as of May 28, 1991, the cause of the strikers' unemployment was no longer the work stoppage, but the fact that they had been permanently replaced. It thus granted benefits for the week ending June 8, 1991. Appeal by Employer to this Court followed.[3]

We begin our analysis by explaining first what is not at issue in this case. The weeks for which the strike was in effect which predated the permanent replacement of employees are not at issue in this case. Further, the weeks subsequent to the week ending June 8, 1991 are not at issue in this

2. Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, as amended.

3. There has been no cross-appeal filed by the Union or any striking employee.

case.[4] What is at issue in this case, and the **ONLY** matter which is before us, is the week ending June 8, 1991. And, the precise legal question we are asked to decide is: where an employer hires *permanent* employees to replace striking employees, should the striking employees nonetheless be required to make an unconditional offer to return to work in order to avoid being disqualified for benefits under Section 402(d) of the Law.[5] That Section reads as follows:

An employee shall be ineligible for compensation for any week—

. . . .

(d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lock-out) at the factory, establishment or other premises at which he is or was last employed: Provided, That this subsection shall not apply if it is shown that (1) he is not participating in, or directly interested in, the labor dispute which caused the stoppage of work, and (2) he is not a member of an organization which is participating in, or directly interested in, the labor dispute which caused the stoppage of work, and (3) he does not belong to a grade or class of workers of which, immediately before the com-

4. Employer here asks for a remand to demonstrate that it has in fact offered positions to striking employees who were "permanently replaced." The appropriate remedy, however, is not a remand, because eligibility must be determined upon a week-by-week basis, *see High v. Unemployment Compensation Board of Review*, 505 Pa. 379, 479 A.2d 967 (1984), but is a hearing pertaining to weeks subsequent to the week ending June 8, 1991, which weeks are not at issue in this appeal.

5. Employer maintains that "permanent replacement" is a term of art in federal labor relations and that, although permanently replaced, the striking individuals' status as employees continues until they have obtained other employment. Be that as it may, the status of the strikers as determined by federal labor law is not binding or even necessarily relevant with regard to state unemployment law since the different laws have different policies and involve different rights. *See Odgers v. Unemployment Compensation Board of Review*, 514 Pa. 378, 525 A.2d 359 (1987). Moreover, in this case there were two distinct classifications of replacement employees hired by Employer, temporary replacement employees and permanent replacement employees, and some of the persons who had been hired as temporary replacement employees had their classification changed to permanent replacement employees. (Board finding No. 24).

mencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in, or directly interested in, the dispute. 43 P.S. § 802(d).

In *Acme Corrugated Box Co., Inc. v. Unemployment Compensation Board of Review*, 131 Pa.Commonwealth Ct. 251, 254, 570 A.2d 100, 101 (1990) (Acme II), we held that:

> [A] striking employee may not be denied unemployment compensation benefits under Section 402(d) after he has made an unconditional offer to return to work under the terms of an expired contract, where an employer chooses to keep a replacement employee rather than permit a striking employee to return to work.

This language, however, did not require as part of the holding of the case that an unconditional offer to return to work be made; it simply stated that where an unconditional offer to return to work had been made benefits could not be denied.

*Acme II* was followed by three opinions of this Court dealing with a nuance of the same issue, the most consequential of which was *T.B. Wood's Sons Co. v. Unemployment Compensation Board of Review*, 150 Pa.Commonwealth Ct. 217, 615 A.2d 883 (1992), where a panel decision had a majority opinion, a concurring opinion, and a dissent without an opinion. The referee and Board in *T.B. Wood's* found that after a work stoppage on April 30, 1990, the claimants were entitled to benefits beginning with the week ending June 16, 1990, because the employer had hired permanent workers to replace the striking union employees and had also subcontracted out 40–60% of the work performed at the plant. The Board held, therefore, that the employer had severed the employment relationship by hiring permanent replacement workers and by permanently subcontracting out the work. The majority opinion of this Court reversed the Board, relying upon the *Acme II* decision, holding that as a condition precedent to receiving benefits claimants were required to unconditionally offer to return to work, *even though 40–60% of the work had been contracted out and all of the remaining work*

*at the plant was being performed by permanent replacement employees.*[6] Thus, by transforming what had been a *fact* in *Acme II* to an absolute legal requirement, the majority opinion in *T.B. Wood's* concluded that "[t]o satisfy the strictures of *Acme II*, the Union was obligated to make an unconditional offer to return to work." 150 Pa.Commonwealth Ct. at 225, 615 A.2d at 887.

The concurring opinion in *T.B. Wood's* agreed with the result reached by the majority, *i.e.*, that benefits should be denied for the week ending June 16, 1990, but reasoned that the denial was proper only because of the uncontroverted evidence that the employer had not yet hired the replacement workers and therefore work was still available to the striking workers. Judge Narick in his concurring opinion succinctly wrote:

> The Board in its Finding No. 9 found that the Employer on or about June 5 to June 7, 1990 began to hire permanent replacements to replace the employees that engaged in the work stoppage on April 30, 1990. However, in its Findings No. 9, 15 and 16, it leaped incredibly to the conclusion that the Employer hired 193 replacements and thereby effectively discharged the 322 unit employees as of the week of June 16, 1991 because work was no longer available since they were replaced or the work was contracted out. These incredible findings fly in the face of the findings of the referee that the Employer hired 193 replacements out of a work force of 322 *as of October 19, 1990.*

*Id.* at 228, 615 A.2d at 889 (emphasis added).

The concurring opinion therefore concluded that the findings of the Board were not supported by substantial evidence and, for the week ending June 16, 1990, and only for that week, benefits should be denied. Judge Narick noted that the

6. The employer in *T.B. Wood's* had hired 193 replacement workers (Board finding No. 10) and "by contracting the work out, the employer no longer made work available to the remaining 129 employees" (Board finding No. 14). Since the total unionized work force represented by UAW Local 695 was 322 employees, all of the work that those employees performed was now being performed by others (193 + 129 = 322).

Board in *T.B. Wood's* stated that it made no findings and drew no conclusions "with regard to the week following the week ending June 16, 1990." *Id.* at 227, 615 A.2d at 888.

Following *T.B. Wood's*, this Court filed two opinions relying upon *T.B. Wood's* as authority for the requirement that even where striking workers are permanently replaced, the union must make an unconditional offer to return to work in order for its members to become eligible for unemployment compensation benefits. *See Silo, Inc. v. Unemployment Compensation Board of Review,* 153 Pa.Commonwealth Ct. 163, 620 A.2d 663 (1993), and *Bruce Plastics, Inc. v. Unemployment Compensation Board of Review,* 153 Pa.Commonwealth Ct. 439, 621 A.2d 1130 (1993).

The issue we must decide today is whether, as argued by the Board and the Bureau of Unemployment Compensation Benefits and Allowances (Intervenor), these recent decisions are inconsistent with the Pennsylvania Supreme Court's decision in *Penflex v. Bryson,* 506 Pa. 274, 485 A.2d 359 (1984).

We begin our analysis by noting that the proper inquiry when determining the cause of a claimant's unemployment must be confined to the immediate cause of unemployment. *Acme II.* Causation for unemployment must be determined for each week for which benefits are claimed. *Westmoreland County Commissioners v. Unemployment Compensation Board of Review,* 82 Pa.Commonwealth Ct. 313, 475 A.2d 170 (1984). Case law recognizes that with respect to a work stoppage the situation may change on a day-to-day basis and, accordingly, what begins as a situation where employees should be denied benefits may ultimately develop into a situation where benefits at a later point in time should be granted. Here there is no question that initially when the claimants began their strike they were not eligible for benefits. The Board argues, however, that once the striking employees were *permanently* replaced Section 402(d) was no longer applicable because that Section presupposes an employer-employee relationship and such relationship is severed by the permanent

replacement of the employees. The Board relies upon *Penflex* as the foundation of its argument.

While the facts in *Penflex* are not identical to those here, we believe that the reasoning of that case is appropriate to the circumstances of this case. In *Penflex*, despite negotiations, no new agreement was reached before the date of the expiration of the relevant collective bargaining agreement. While the Union advised its members not to strike, they nonetheless did so. The strikers, however, failed to comply with certain notice provisions relevant to federal statutes. The employer *terminated* the strikers because of its view that the strike was illegal. The claimants applied for unemployment compensation benefits and the employer then argued that the claimants should be denied benefits because of their participation in an illegal strike. The referee determined that the failure to comply with certain federal labor statutes did not establish *willful misconduct* under Section 402(*e* ) of the Law, 43 P.S. § 802(e), and granted benefits. Moreover, the referee ruled that the cause of the claimant's unemployment was not a work stoppage resulting from a labor dispute under Section 402(*d* ), but instead, a discharge from employment. We particularly note that no offer to return to work had been made by the claimants.

What is important for purposes of this case is that the referee did not analyze the case under Section 402(*d* ) (the labor dispute disqualification); rather, he analyzed it under Section 402(e) (the discharge provision, which authorizes benefits for discharged or laid off employees provided that they have not engaged in willful misconduct) and ruled that there was no willful misconduct. The Board agreed. On appeal this Court found willful misconduct and reversed, but its analysis was likewise under Section 402(e). The Supreme Court then reversed this Court, again employing a Section 402(e) analysis and wrote:

> Where the employer-employee relationship is permanently severed, the employee no longer has any real interest in the outcome of the labor dispute. Accordingly, the dispute is not the immediate cause of his unemployment and the

disqualification set forth in Section 402(d) is inapplicable to him.

*Penflex,* 506 Pa. at 287–88, 485 A.2d at 366 (footnote omitted).

The Court further held:

[W]here a claimant becomes temporarily absent from work as a result of a labor dispute, other than a lockout, he is unquestionably ineligible for benefits under Section 402(d) during the time he is involved in the work stoppage. However, if the claimant's employer terminates his employment, the labor dispute which resulted in the work stoppage no longer directly concerns him. The question then becomes whether he was fired for willful misconduct. . . . Generally, if the claimant's participation in the work stoppage constituted willful misconduct, he remains ineligible for benefits following his discharge from employment under Section 402(e); otherwise, his disqualification under Section 402(d) is lifted and he is entitled to compensation.[11]

---

11. As a matter of first impression, the plain language of the statute would not be entirely clear with respect to whether a striking employee, who is clearly ineligible for benefits under Section 402(d), becomes eligible for unemployment compensation on being dismissed from employment for participating in the strike. However, a long line of decisions have held that a striking employee is no longer subject to disqualification under Section 402(d) following his dismissal and becomes eligible for benefits unless his dismissal was for willful misconduct within the meaning of Section 402(e). See cases cited [in text]. These cases elicited no response by way of amendment or clarification from the Legislature.

*Id.* at 289, 485 A.2d at 366–67 (citations omitted).

 Based on the Supreme Court's *Penflex,* we hold today that where an employer hires *permanent* replacement employees, absent any evidence in the record and pertinent findings thereon that continuing work remains available to the striking workers, the case must be considered as one where the employment relationship has been severed. And, in such circumstances, the determination as to entitlement to benefits should be made under Section 402(*e* ), not Section 402(*d* ). We further make it clear that the burden is upon the employer to show that it advised the striking employees that despite the hiring of permanent replacements work was still available to

them. We further hold that should the employer choose to replace only some employees the burden is on it to demonstrate what employees it is replacing as that information is solely within its knowledge. Should it fail in its burden, benefits will be due all employees.[7]

Because we conclude that the permanent replacement of striking employees constitutes a dismissal and, accordingly, must be analyzed under Section 402(e) of the Law, we overrule *Silo* and *Bruce*, concluding that they are contrary to the principle of law enunciated in *Penflex* by the Supreme Court.[8] We distinguish *T.B. Wood's* on the basis that it is a majority opinion of this Court only for purposes of holding that benefits should be denied in that case and not for the rationale employed to reach that conclusion. Further, we need not overrule *Acme II* because the case did not mandate that a union make an unconditional offer to return to work.[9]

Based on the foregoing discussion, the order of the Board is affirmed.

## ORDER

NOW, June 30, 1993, the order of the Unemployment Compensation Board of Review in the above-captioned matter is hereby affirmed.

PELLEGRINI, J., concurs in the result only.

**7.** Inasmuch as Employer here did not designate specific employees who were replaced, we believe it is appropriate that it bear the consequences of that decision.

**8.** In *Bruce* the offer to return to work was conditional. That, however, is no basis for distinguishing it. We hold today that where, as in *Bruce*, permanent replacements are hired no offer to return is necessary. Hence, whether any offer which is made is conditional is legally irrelevant.

**9.** Employer also argues in its brief that it should at least be entitled to an offset for strike benefits that Claimants received from the Union during the course of the strike. The Board argues, however, and we agree, that that issue was not properly before the referee in the context of this case. The Board, however, assured this Court at oral argument that should Employer choose to pursue this issue by filing the appropriate information it will be heard on the merits with regard to any offset to which it might be entitled.

PALLADINO, Judge, dissenting.

I respectfully dissent. Because I believe that an employee who initiates a work stoppage must offer to end it before becoming eligible for unemployment compensation benefits, I would reverse the decision of the Board and deny Claimant benefits.

As noted by the majority, the issue presented in this matter is where an employer hires "permanent" employees to replace striking employees, must the striking employees make an unconditional offer to return to work in order to avoid being disqualified for benefits under Section 402(d) of the Unemployment Compensation Law (Law).[1]

This precise issue was addressed by this court as recently as February 1993 in *Bruce Plastics, Inc. v. Unemployment Compensation Board of Review*, 153 Pa.Commonwealth Ct. 439, 621 A.2d 1130 (1993) and *Silo, Inc. v. Unemployment Compensation Board of Review*, 153 Pa.Commonwealth Ct. 163, 620 A.2d 663 (1993). Relying on *Penflex v. Bryson*, 506 Pa. 274, 485 A.2d 359 (1984), the majority cavalierly concludes that *Silo, Bruce Plastics* and other established precedent of this court were wrongly decided. Therefore, the majority overrules those decisions and holds that when an employer hires replacement workers, the striking employees need not offer to return to work before becoming eligible for unemployment compensation benefits. I strongly disagree.

1. Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(d) which provides in pertinent part:

 An employe shall be ineligible for compensation for any week—
 (d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lock-out) at the factory, establishment or other premises at which he is or was last employed: Provided, That this subsection shall not apply if it is shown that (1) he is not participating in, or directly interested in, the labor dispute which caused the stoppage of work, and (2) he is not a member of an organization which is participating in, or directly interested in, the labor dispute which caused the stoppage of work, and (3) he does not belong to a grade or class of workers which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in, the dispute.

Initially, I note that the supreme court specifically limited the rationale of *Penflex* to the facts of that case, stating, "[o]ur holding today is a very narrow one which will not apply in most labor disputes." 506 Pa. at 296, 485 A.2d at 370. Additionally, the majority concedes that the facts of *Penflex* are distinguishable from those before us in the present action. The most important distinction between the facts in the two cases is that the employees in *Penflex* were terminated by their employer the same day the employees initiated what the employer considered to be an illegal strike.

The supreme court began its analysis by noting that section 402(d) of the Law only applies in situations where there is an ongoing employer/employee relationship. Next, the court concluded that because the employees in *Penflex* were unquestionãbly terminated on the day the strike began, the employment relationship was severed, and therefore, section 402(d) did not apply. The court then went on to analyze the case under section 402(e) of the Law, 43 P.S. § 802(e), holding that the employees' actions in initiating the strike did not constitute willful misconduct and, therefore, the employees were entitled to benefits.

The issue in *Penflex* was not whether the employment relationship was severed by the actions of the employees or the actions of the employer, but rather, the issue was limited to a determination of whether the employees' actions, in initiating a purportedly illegal strike which resulted in their dismissal, rose to the level of willful misconduct. Because neither the facts of *Penflex* nor the issue presented therein are analogous to the present action, I submit that the majority's reliance on *Penflex* is misplaced.

*Silo*, a unanimous panel decision is factually and legally indistinguishable from the present action and is therefore, controlling. In *Silo*, the employees continued to work under the terms of an expired collective bargaining agreement while the parties negotiated the terms of a new agreement. The employer notified its employees that in the event of a strike, it would continue operations and try to recruit "permanent" replacement workers. Thereafter, the union initiated a work

stoppage and established picket lines. Later that day the employer began to hire replacement workers. While "permanently" replaced, the employees continued to accrue sick leave, pension credit and seniority. The employer unilaterally implemented the terms of its final proposal. At no time did the union make an unconditional offer to return to work.

This court, citing *Acme Corrugated Box Company v. Unemployment Compensation Board of Review,* 131 Pa.Commonwealth Ct. 251, 570 A.2d 100 (1990) (en banc) *(Acme II* )[2] and *T.B. Wood's Sons Co. v. Unemployment Compensation Board of Review,* 150 Pa.Commonwealth Ct. 217, 615 A.2d 883 (1992),[3] concluded that the employees were ineligible for benefits under section 402(d) of the Law because the work stoppage remained the result of a strike, the hiring of "permanent" replacement workers notwithstanding, until an unconditional offer to return to work was made by the employees.

In the present action, as in *Silo,* the employees continued to work under the terms of an expired collective bargaining agreement while negotiations for a new agreement continued. The union then initiated a work stoppage and established picket lines. The employer decided to continue operations and striking employees were informed that employer would begin to hire "permanent" replacements if a settlement was not reached. Even though "permanently" replaced, the employees continued to accrue sick leave, seniority, and life insurance benefits and continued to negotiate a new contract.

**2.** In *Acme II,* the striking employees were replaced by "permanent" replacements. Thereafter, the striking employees made an unconditional offer to return to work which was refused by the employer. This court held that the employment relationship was severed when the offer to return to work was refused, not when the "permanent" replacements were hired.

**3.** In *T.B. Wood's,* the employer hired "permanent" replacement workers and subcontracted out 40–60% of the work performed at the plant where the striking employees worked. This court concluded that the requirements of *Acme II* had not been met because the union failed to make an unconditional offer to return to work. Therefore, we held that the employees were ineligible for benefits under section 402(d) of the Law.

Despite the obvious indicia of continued employment, the majority concludes that the employment relationship was severed when employer "permanently" replaced Claimant, and therefore, Claimant was no longer disqualified from receiving benefits under section 402(d) of the Law. Furthermore, the majority concludes that because employer hired 43 replacement workers, the employment relationship with all 121 striking employees was severed, thus, making all striking employees eligible for unemployment compensation benefits.

I submit that in accordance with established precedent of this court, the striking employees of Canonsburg General Hospital are ineligible for benefits under section 402(d) of the Law. Accordingly, I would continue to hold that even if a striker is "permanently" replaced during a strike, the cause of the striker's unemployment remains the strike, and not the hiring of a replacement, unless and until the striker offers to return to work under the terms of the expired contract and that offer is rejected by the employer. At that point, it is the employer who has refused to return to the status quo; therefore, it is the employer who is responsible for financing the labor dispute.