**TITAN TIRE CORPORATION,**
Appellant,

v.

**EMPLOYMENT APPEAL BOARD, Appellee.**

No. 00–0340.

Supreme Court of Iowa.

Feb. 27, 2002.

Gene R. La Suer and Becky S. Knutson of Davis, Brown, Koehn, Shors & Roberts, P.C., Des Moines, for appellant.

Richard R. Ramsey, Des Moines, for appellee.

Mark T. Hedberg and Joseph L. Walsh of Hedberg, Owens, & Hedberg, P.C., Des Moines, for United Steel Workers of America, Local 164.

TERNUS, Justice.

In this appeal, we must decide whether the appellee, Employment Appeal Board, correctly determined that striking workers of appellant, Titan Tire Corporation, were eligible for unemployment benefits. Although striking employees are normally disqualified from receiving benefits, *see* Iowa Code § 96.5(4) (1997), the agency determined that Titan Tire had severed its employment relationship with the strikers, ending their disqualification. This determination rested on the agency's findings that the employer had, to some extent, permanently replaced its striking workforce and had not notified the replaced workers that jobs were still available to them should they choose to return to work.

The agency's ruling was affirmed by the district court on judicial review. Finding no error in the legal principles applied by the agency and finding substantial evidence in the record to support its factual determinations, we affirm.

## I. *Scope of Review.*

■ Iowa's Administrative Procedure Act, Iowa Code chapter 17A, governs our review of unemployment benefit cases. *Dico, Inc. v. Iowa Employment Appeal Bd.,* 576 N.W.2d 352, 354 (Iowa 1998). Section 17A.19(8) provides that a party may successfully challenge an agency decision when the party's substantial rights have been prejudiced because the agency action "is unsupported by substantial evidence" or "is affected by other error of law." Iowa Code § 17A.19(8). The court may "affirm, reverse, modify, or grant any other appropriate equitable or legal relief." *Schoenfeld v. FDL Foods, Inc.,* 560 N.W.2d 595, 598 (Iowa 1997).

■ Our review is for correction of errors of law. *PanDa Eng'g v. Eng'g & Land Surveying Examining Bd.,* 621 N.W.2d 196, 198 (Iowa 2001). Because it

is not de novo, we do "not reassess the weight to be accorded various items of evidence. Weight of evidence remains within the agency's exclusive domain." *Burns v. Bd. of Nursing*, 495 N.W.2d 698, 699 (Iowa 1993). Consequently, "[i]f the agency's findings of fact are supported by substantial evidence, those findings are binding on judicial review." *PanDa Eng'g*, 621 N.W.2d at 198. "Evidence is substantial if a reasonable person would find it adequate for reaching a conclusion, even though a reviewing court might reach a contrary inference." *Oscar Mayer Foods Corp. v. Tasler*, 483 N.W.2d 824, 830 (Iowa 1992). In determining whether substantial evidence exists, the court considers all the evidence, including that offered in opposition to the agency's findings. *Burns*, 495 N.W.2d at 699. "We apply agency findings broadly and liberally to uphold, rather than to defeat, an agency's decision." *Organic Techs. Corp. v. State ex rel. Iowa Dep't of Natural Res.*, 609 N.W.2d 809, 815 (Iowa 2000).

II. *Background Facts and Proceedings*

The following facts are supported by substantial evidence. On May 1, 1998, approximately 650 members of the United Steel Workers of America, Local 164 walked off the job at the Titan Tire factory in Des Moines. The company asserted the strike was the result of economic issues upon which the company and the union could not agree; the union, however, maintained that the strike was the result of unfair labor practices committed by Titan Tire.

In the weeks after the strike began, Maurice Taylor, chief executive officer of Titan International Inc., held various press conferences in which he discussed the continuing strike at the Des Moines plant. In a press conference on May 14, 1998, he stated if a settlement is not reached with the union, "we will start moving equipment out of the Des Moines facility to the Brownsville[, Texas] location and it will be irreversible." At a subsequent press conference in early June 1998, Taylor made similar statements. Taylor announced that Titan Tire would move tire-making equipment to Texas because of the ongoing strike in Des Moines. This shift in production, according to Taylor, would permanently move as many as 300 jobs out of the Iowa plant. He stated that his decision was "irrevocable."

Two weeks after Taylor's second press conference, on June 17, 1998, all bargaining unit members of the union were sent a certified letter from Gary Carlson, president of Titan Tire. In this letter, Carlson stated that the company would be submitting to the union "its last, best, and final offer" on June 22, 1998. Carlson enclosed the offer for the members to review. After generally stating the terms of the new offer, the letter continued:

> We ask that you now return to work in accordance with the attached schedule. You will be paid in accordance with the new agreement and we will immediately begin to use the new contract language. *If you fail to report back to work in accordance with the enclosed schedule, Titan Tire will hire permanent replacement workers to fill your position and you may lose your right to return to work.*

(Emphasis added.) The attachment scheduled employees to return to work between June 21 and June 24, 1998. This letter was the last written communication between the company and the striking union members concerning the availability of jobs.

Despite the company's request that the striking workers return to work, nearly all of the union members remained on strike. After the certified letter was sent, John

Peno, president of the union, learned from company management that jobs were being moved out of the Des Moines plant to Texas and that new hires had replaced union members.

In late July, Taylor appeared at a rally in front of Titan International's headquarters in Illinois and was quoted in the newspaper as saying:

"It's a tragedy, because we're running in Des Moines with 200–some (new) employees, *so most of the people on that line don't have jobs, even if they had a contract.*"

"*They're out of jobs.* They don't understand this, and the union is not telling them the truth."

"They got their best and final offer and that's where it is. If they're coming back, they're coming back under the terms that we've set. *If they decide to come back, then what happens is, they only get the jobs that are left, by seniority.*"

(Emphasis added.)

Based on information it had received, the Unemployment Insurance Bureau sent a letter of inquiry to Titan Tire on August 10, 1998. The Bureau stated that it had learned that Titan Tire had reduced the Des Moines workforce by 200 to 300 jobs and had started to resume production at the plant with replacement workers. It asked for specific information concerning the elimination of jobs at the Des Moines plant and the hiring of replacements. The company responded, denying that the transfer of equipment to Texas had eliminated any more then 25 jobs and asserting that there were "many jobs available to striking workers who are willing to return to work." The company also stated in its response that approximately 250 workers had been granted permanent replacement status and that the hiring of replacement workers was an ongoing process. Titan

Tire claimed it later revoked the permanent status of the replacement workers to avoid having to provide their names and addresses to the union. Neither the union nor its members were advised that the replacement workers were no longer considered permanent until the hearing before the administrative law judge (ALJ).

Prior to the strike, Titan Tire had provided its employees with a 401(k) retirement plan, which the company held in each employee's name until the employee retired or separated from the company. After the strike, the company turned over only three accounts to strikers who had formally quit or retired, or who had been discharged. Other striking employees were not given access to their retirement accounts because Titan Tire considered the striking workers to be employees in good standing.

On August 31, 1998, the Bureau determined that striking workers who had made application for unemployment compensation were eligible for benefits. The decision stated that a stoppage of work had occurred at the Titan Tire plant due to a labor dispute. It further stated that the strikers had been notified that they were being replaced, which terminated the employment relationship. Therefore, concluded the Bureau, the strikers were entitled to benefits "as long as [they] met all the other eligibility requirements." This decision affected approximately 400 workers who had applied for unemployment compensation.

Titan Tire appealed and an evidentiary hearing was held before an (ALJ). The ALJ found that Titan Tire had notified the strikers in its June letter that they would be replaced if they did not return to work as scheduled. The ALJ concluded the employment relationship between the workers and Titan Tire was severed by the

company's hiring of permanent replacement workers unless the company proved that work was actually available to the strikers and that it had notified the strikers that jobs were still available. The ALJ held that Titan Tire had in essence laid off 200 workers when it transferred production to Texas and, in addition, had hired 250 permanent replacements. In addition, the ALJ held that Titan Tire had not notified the union or its members that work was available. Accordingly, the ALJ ruled that the claimants were eligible for benefits. This decision was affirmed on appeal by the Employment Appeal Board and by the district court on judicial review.[1]

Titan Tire has appealed to this court. Because we think it is helpful to consider the issues raised on appeal in the context of the law applicable to unemployment compensation claims of striking workers, we briefly review the governing legal principles before reaching the merits of the employer's appeal.

### III. *Law Governing Claims of Striking Workers.*

 An employee who is not working "due to a stoppage of work which exists because of a labor dispute" is disqualified from receiving unemployment benefits. Iowa Code § 96.5(4). The work stoppage must be the cause of the unemployment to result in disqualification. *Bridgestone/Firestone, Inc. v. Employment Appeal Bd.*, 570 N.W.2d 85, 91 (Iowa 1997).

 In *Bridgestone/Firestone*, we held that "when an employer permanently replaces striking workers, it thereby severs the employment relationship unless the employer can show work remained despite the replacement and the claimant was so advised." *Id.* at 95–96. Thus, where

striking workers have been permanently replaced and the employer fails to show that work remained *and* that workers were advised that work remained, "the labor dispute and its consequent work stoppage is no longer the cause of the claimants' unemployment." *Id.* at 95. In those circumstances, the disqualification imposed by section 96.5(4) is removed. *Id.* We turn now to the issues on appeal.

### IV. *Issues on Appeal.*

Titan Tire claims on appeal that the Board erred in determining that the striking workers were eligible for unemployment benefits. There is no dispute that the striking workers were initially disqualified from receiving benefits pursuant to section 96.5(4). The issue here is whether the employer severed the employment relationship by hiring replacement workers, thereby removing the disqualification. The specific dispute with respect to this issue centers on whether the agency correctly determined that Titan Tire had not met its burden of proof under *Bridgestone/Firestone* to show that work was available and that it had so advised its employees.

On appeal, the employer asks this court "to determine" that the striking workers understood that work was available to them and that they had not been permanently replaced. Because our review is at law, however, we are not at liberty to determine these facts anew. The most that we can do is examine the record to assess whether there is substantial evidence to support the findings made by the agency.

Titan Tire also challenges a decision made by the ALJ at the hearing to admit certain newspaper articles offered by the

---

1. Throughout these proceedings the union has participated on behalf of the claimants.

claimants. We will address this evidentiary ruling first.

## V. *Admission of Newspaper Articles.*

■ Titan Tire argues on appeal that evidence in the form of newspaper articles should not have been admitted by the ALJ. It claims this evidence is inadmissible hearsay and that the requirements of Iowa Code section 17A.14, governing the admission of evidence in a contested case hearing, were not met. We find it unnecessary to determine whether the ALJ erred or abused its discretion in admitting this evidence because Titan Tire has not shown that any error prejudiced its substantial rights. *See* Iowa Code § 17A.19(8) (requiring party challenging contested case decision to show that its substantial rights were prejudiced).

The challenged evidence consists of newspaper accounts of statements made by Taylor at various press conferences that production had been moved to Texas, that this transfer of equipment eliminated jobs in Des Moines, and that, in addition, the company was hiring replacements for the striking employees. We do not think this evidence can be deemed prejudicial in view of the other evidence before the agency. The company stated in response to the Bureau's inquiry that it had hired 250 permanent replacements and that hiring of replacements was ongoing. At the hearing, Titan Tire's company representative, William Campbell, testified that "people were hired to come in and fill the jobs that were previously being done by bargaining unit employees." He confirmed that over 300 replacement workers had been employed by the date of the hearing. Thus, the fighting issue in this case was not whether replacement workers were hired—the company admitted they were. The determinative issue was whether the striking workers, who were notified that they would be permanently replaced, were also told that even if they did not return in accordance with the company's schedule, there would be jobs available to them should they decide to come back to work after the June 24 deadline.

In view of the fact that the challenged evidence did not impact the determinative issue in this case, we conclude any error or abuse of discretion in the admission of the newspaper articles did not prejudice the company's substantial rights. Therefore, it is not necessary to determine the correctness of the ALJ's ruling on this evidentiary matter. We proceed now to consider whether the Board's finding that Titan Tire did not notify the strikers that jobs were available despite the strikers' failure to report to work as requested by the company is supported by substantial evidence.

## VI. *Notice to Strikers of Available Work.*

■ The parties agree that when the union workers walked off the job on May 1, 1998, there was a stoppage of work due to a labor dispute. At that point in time, the claimants were disqualified from receiving unemployment benefits because the cause of their unemployment was the strike. *See* Iowa Code § 96.5(4). The contested issue here is whether the strikers continued to be unemployed due to the labor dispute after they failed to return to work in accordance with the schedule attached to the company's June letter. In that letter, Titan Tire told the claimants the company was making its "last, best, and final offer," and if the strikers did not return as requested by the company, permanent replacements would be hired.

As noted previously, the agency concluded that Titan Tire had not proved the requirements established by *Bridgestone/Firestone* to continue the claimants'

disqualification, namely, that work was available and the strikers were so advised. 570 N.W.2d at 95–96. The agency found that although some jobs still existed for striking workers after the deadline for the strikers' return to work had expired, the company had failed to show how many and which jobs remained. *See id.* at 93 (discussing *Canonsburg Gen. Hosp. v. Unemployment Compensation Bd. of Review,* 156 Pa.Cmwlth. 533, 628 A.2d 503, 510 (1993), *aff'd,* 540 Pa. 531, 658 A.2d 790 (1995), which stated "that should the employer choose to replace only some employees the burden is on it to demonstrate what employees it is replacing"). In addition, the agency found that Titan Tire had not notified the striking employees collectively or individually that work was available. On appeal, Titan Tire challenges both factual findings. We find it necessary, however, to address only the finding that the strikers had not been told that "despite the hiring of permanent replacements work was still available to them." *Id.* at 95. That is because "[e]ven if such work [was] available, failure to so advise the claimants will result in removing the section 96.5(4) disqualification." *Id.*

Turning then to the record, we agree with the district court that there is substantial evidence to support the agency's finding that the company did not notify the striking workers that jobs were available. Titan Tire admitted at the hearing that no further contact was made with the striking workers concerning the availability of jobs after the June 17 letter indicating that workers would be replaced if they did not return as set forth in the attached schedule. Union president Peno testified the union was never informed that permanent replacements had not been hired. In fact, Peno testified that on August 20, 1998, in response to his demand that replacement workers would have to come out as a condition of any agreement, Taylor and Carlson "adamantly" said that would never happen because "those people have replaced your members." Thereafter, testified Peno, he told strikers who inquired about their employment status that they had been permanently replaced.

Titan Tire argues that the agency misinterpreted the June 17 letter and that Carlson, the company president, clearly indicated in that letter that work was available for those wishing to return. Although it is true that Titan Tire asked the strikers to return to their jobs, implying that jobs were available at that time, the company stated in the same letter that "[i]f [the striking employees] fail to report back to work in accordance with the enclosed schedule, *Titan Tire will hire permanent replacement workers to fill [their] position[s]* and [the striking employees] may lose [their] right to return to work." (Emphasis added.) Thus, the relevant question is not whether jobs were available on June 17, but rather whether jobs were available upon expiration of the company's return-to-work schedule on June 24.

The company also argues that, unlike the employer in *Bridgestone/Firestone,* Titan Tire never told its employees that they had actually been replaced. *See Bridgestone/Firestone,* 570 N.W.2d at 87 (quoting letter from employer in which employer tells employees that they "had been permanently replaced"). We do not find this distinction to have any significance. Titan Tire's statement that it would hire permanent replacements if the employees did not return to work by June 24 amply supports the agency's finding that a reasonable person in the striking workers' position would understand that upon expiration of the scheduled resumption of work on June 24, 1998, permanent replacement workers would be hired for those strikers who failed to return. This interpretation of the June letter is also supported by Union

president Peno's testimony concerning the later negotiations between the company and the union, at which time Taylor and Carlson indicated that permanent replacements had been hired. In addition, in response to the Bureau's inquiry, the company admitted in August 1998 that it had already hired 250 permanent replacements. Even the company's witness at trial conceded that the replacement workers had been considered permanent employees until, for unrelated reasons, they were subsequently reclassified as temporary. Significantly, the record shows that Titan Tire never notified the union or the claimants that the status of the replacements had been changed. Thus, the record shows that, until the hearing in late October 1998, the strikers reasonably believed the company had permanently replaced them just as it had stated it would. We conclude, therefore, that there is substantial evidence to support the agency's interpretation of the June letter to striking employees, namely, that after the June 24 deadline, jobs would no longer be available to the claimants. Accordingly, this letter effectively terminated the employment of strikers who did not return as requested, unless jobs continued to be available and the employer notified the claimants of that fact as required by our *Bridgestone/Firestone* decision.

■ Titan Tire seeks to avoid the requirement that it must inform strikers that jobs remained available despite the employment of replacements on the basis that the strike here was alleged by the union to be the result of unfair labor practices committed by Titan Tire. The company argues that under the National Labor Relations Act an employer cannot legally permanently replace a worker who is striking due to unfair labor practices. *See Pirelli Cable Corp. v. NLRB*, 141 F.3d 503, 510 n. 1 (4th Cir.1998) (stating

that "[u]nfair labor practice strikers are entitled to immediate reinstatement upon their unconditional offer to return to work regardless of whether replacement workers have been hired by the employer during the strike" (citing *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 278, 76 S.Ct. 349, 355–56, 100 L.Ed. 309, 319 (1956))). While this prohibition may exist, it does not impact the present dispute. The issue here is not whether Titan Tire could *legally* replace the striking workers; the issue here is whether Titan Tire informed the strikers that it had *not* permanently replaced them after having told them it would do so if they did not return to work by June 24, 1998.

■ The company also argues that it should not be held to the notification requirement adopted in *Bridgestone/Firestone* because it is prohibited by federal law from contacting striking workers. The employer relies on cases that hold it is a violation of the National Labor Relations Act to solicit workers to abandon an unfair-labor-practices strike and return to work. *See, e.g., NLRB v. Robin Am. Corp.*, 654 F.2d 1022, 1026 (5th Cir.1981); *NLRB v. Bradley Washfountain Co.*, 192 F.2d 144, 152–53 (7th Cir.1951); *NLRB v. Montgomery Ward & Co.*, 133 F.2d 676, 681–82 (9th Cir.1943). The persuasiveness of this argument is somewhat undermined by the fact that this prohibition apparently did not discourage Titan Tire from communicating with the striking union members on June 17. Nonetheless, even if the company was prohibited by federal law from asking striking workers to return to work, it could have informed the *union* that jobs were still available to the strikers despite the employment of replacement workers. We think that under the circumstances here, where the union claimed the strike was based on the company's unfair labor practices, notice to the union that job

openings continued to exist for all workers on strike would have met the employer's notification responsibility under *Bridgestone/Firestone.* Consequently, we do not think the nature of the strike involved in this case relieved Titan Tire of its responsibility to advise the strikers via notification to the union that work remained available.

VII. *Conclusion.*

In summary, we find error, if any, in the admission of newspaper accounts of statements made by company representatives did not prejudice Titan Tire's substantial rights. In addition, there is substantial evidence to support the agency's finding that the employer did not notify its striking workers that they still had jobs after informing them they would be replaced if they did not return to work as scheduled. As a consequence, the company's hiring of replacement workers terminated the employment relationship and removed the disqualification imposed on the strikers by section 96.5(4). Finding no error in the Board's decision that the striking employees were eligible for unemployment compensation, we affirm.

**AFFIRMED.**