ORGANIC TECHNOLOGIES CORPO-
RATION, Tim Danley, and Ken
Renfrow, Appellants,

v.

STATE of Iowa ex rel. IOWA DE-
PARTMENT OF NATURAL
RESOURCES, Appellee.

No. 98–1242.

Supreme Court of Iowa.

April 26, 2000.

Mark Landa and James G. Sawtelle of Sullivan & Ward, P.C., Des Moines, for appellants.

Thomas J. Miller, Attorney General, and David R. Sheridan and David L. Dorff, Assistant Attorneys General, for appellee.

LAVORATO, Justice.

The Department of Natural Resources (DNR) issued an administrative order in which it alleged that Organic Technologies Corporation (OTC), a composting facility owner, had violated (1) Iowa Code chapter 455B, (2) administrative rules promulgated pursuant to this chapter, and (3) the conditions of OTC's permit. The order imposed a fine and revoked the permit. The Environmental Protection Commission (EPC) adopted an administrative law judge's (ALJ) decision finding that the violations had occurred and upholding the fine and revocation. Following OTC's appeal, the district court upheld the EPC's decision affirming the decision of the ALJ. On OTC's appeal from the district court ruling, we affirm.

## I. Background Facts.

OTC operates a composting facility on land it owns in Prole, Warren County, Iowa. It is in the business of composting biodegradable organic materials that, through a biological process, result in the aerobic, thermophilic, self-heating biological decomposition of these materials. During this process, microorganisms convert the raw materials to be composted into an innocuous humus. The composting process produces sufficient heat to destroy seed and pathogenic bacteria, resulting in a product that is acceptable for agricultural, commercial, and residential use.

OTC operates the facility pursuant to a sanitary disposal project permit issued on April 25, 1994. The facility composts yard waste and other source-separated organic waste materials.

OTC began operation as a yard-waste-only composting facility. On June 10, 1992, the DNR issued a developmental sanitary disposal project permit to OTC. The permit allowed OTC, on a temporary, one-year trial basis to experiment with the following composting enhancers and triggers: sawdust, particle board, and plywood scrap; all-paper feed sacks; brewing chips; reject pop cans; wheat glu-

ten/starch; egg shells; and nonsaleable fresh fruits and vegetables. In September the permit was amended to include, on an experimental basis, mixed vegetables, soy oil, and fiber core tubes.

In May 1993, the DNR issued to OTC a general permit for "storm water discharge associated with industrial activity." *See* Iowa Code §§ 455B.103A (authorizing director of DNR to issue general permits for storm water discharge), .186 (1991) (prohibiting discharge of pollutants into waters of the state without a permit from the DNR); Iowa Admin. Code rs. 567–64.3, .4(2), .15(1) (1992). The DNR required OTC to draft a pollution prevention plan within 365 days of the permit date, which OTC eventually filed.

On June 15, the DNR issued OTC a new development project permit with Myron and Kristie Hirschman named as the responsible officials. The new permit essentially renewed the first developmental project permit and expanded the list of enhancers and triggers by adding the following: spent diatomaceous earth, meat casings, all-paper seed sacks, nonrecyclable cellulose fiber, and animal wastes. The new permit specifically exempted OTC from constructing a permanent impervious composting/curing pad as is normally required. *See* Iowa Admin. Code r. 567–105.5(8) (1989).

In August 1993, OTC submitted a Comprehensive Solid Waste Management Plan. The plan was necessary for OTC to obtain a regular—as opposed to a developmental—waste disposal permit. *See* Iowa Code § 455B.305B (1993); Iowa Admin. Code rs. 567–101.5 (1992), 102.12 (1989), 102.14 (1991). The DNR approved the plan on November 15.

The plan included provisions for further expansion and development of OTC's composting operation. These provisions identified four distinct expansion and development phases:

*Phase I.* This expansion will allow OTC to process upwards of 10,000 tons of yard waste and source separated compostables on an annual basis. It will include the construction of a 60' × 120' impervious clay base. It will also include the construction of an additional 120' × 120' concrete pad for initial unloading and blending prior to movement into discrete windrows.

*Phase II.* This expansion will give OTC the ability to process up to 20,000 tons of yard waste and source separated materials per year. The construction of a 60' × 80' covered facility for screening finished material will allow OTC additional quality control over the finished product.

*Phase III.* . . . In order to process up to 30,000 tons of yard waste and source separated compostables it will be necessary for OTC to begin processing and composting materials under cover. . . . During this phase OTC will construct a 60' × 360' covered facility. . . .

*Phase IV.* OTC's goal is to receive and process 50,000 tons of yard waste and source separated compostables at this site. . . . This phase therefore requires additions to the Phase III covered facility which will result in a 120' × 360' covered and partially enclosed composting facility.

On March 8, 1994, OTC submitted an application for a regular permit for its Prole facility. The application included an operating plan, which included a verbatim recitation of the expansion and development plans approved by the DNR in the Comprehensive Solid Waste Management Plan. The DNR issued the permit on April 25.

The permit stated that (1) the Prole project must be operated according to plans and specifications already on file with and approved by the DNR; and (2) any deviation or modification from the plan and specifications required DNR's prior approval, accompanied by an amendment to the permit. *See* Iowa Admin. Code r. 567–102.5, .7 (1989). The permit also specifically listed materials that could be processed at the Prole facility. *See* Iowa Ad-

min. Code r. 567–102.9 (1989) (stating that any permit may be issued subject to conditions specified in writing). The listed materials were confined to those previously described.

The permit further provided:

Prior to commencing the next phase of operation, OTC is required to have the design engineer develop and submit plans for additional Portland cement concrete or asphaltic concrete composting pad(s). It will be necessary for the [DNR] to approve and issue (an) amendment(s) prior to the construction and use of thi (e) e(s) pad(s)....

The permit also warned that failure to comply with Iowa Code chapter 455B, or any rule or order promulgated pursuant to this chapter, may result in a civil penalty and suspension or revocation of the permit.

On July 29, 1994, the DNR issued Amendment #1 to Phase I. The amendment authorized OTC to construct a 60' × 60' wet material handling building and an "L"-shaped 90' × 90' concrete slab or pad next to the building.

In the same month, the DNR began receiving complaints from residents near the OTC facility about offensive odors coming from the facility. The DNR responded by inspecting the facility. As a result of this inspection, the DNR, in July 1995, issued Administrative Order 95–SW–17 to OTC. *See* Iowa Code §§ 455B.175(1), .307(2) (1993).

The order required OTC to properly operate and maintain the compost facility and to comply with the operation requirements of its permit conditions and the DNR rules. The order notified OTC of the DNR's intent to modify OTC's sanitary disposal project permit to restrict the composting operation to yard waste alone.

OTC appealed the order. Thereafter, OTC and the DNR began negotiating solutions that would alleviate problems at the Prole facility and thereby avoid any modification of OTC's permit terms. Among other things, OTC agreed to complete construction of a building to house the operation, with a controlled aeration system for composting.

On September 1, 1995, OTC's owners— Myron and Kristie Hirschman—sold the company to Tim Danley and Ken Renfrow. The DNR issued a new permit to OTC reflecting the change in ownership and listing Tim Danley and Ken Renfrow as responsible officials on the permit. The cover letter accompanying the new permit stated in relevant part:

Enclosed is your sanitary disposal project permit revised to reflect the change in responsible officials for OTC. Since the company name remains the same and only the ownership is changed, a formal title transfer involving facility compliance is technically not necessary. All of the technical and administrative requirements in the permit and Amendment #1 remain the same and the permit expiration date remains the same.

As you are aware, there is a pending administrative order, including a notice of intent to amend the permit further, which is under appeal.... [T]he change in ownership ... does not impact the enforcement of the administrative order in any way.

Following the change of ownership, OTC's new owners met with the DNR's officials who told them that the additional facilities required under the terms of OTC's permit were necessary.

On November 21, 1995, the DNR investigated the Prole facility and prepared a report of its findings, which, along with a cover letter, was mailed to OTC. The cover letter noted that the facility was not being operated in accordance with the permit, the operating plan, and the Iowa Administrative Code. The report specifically noted that, although the facility had reached 20,-000 tons of volume per year, the 60' × 80' screening building required under Phase II had not been constructed. Although Amendment #1 had permitted a 60' × 60' blending building to be built in lieu of the

screening building, the roof and upper walls of this building were destroyed by fire in September 1995 and had not been rebuilt. The report stated that the absence of such an enclosed building was a violation of the terms and conditions of the project permit.

The report also noted that the concrete pad next to the blending building was no longer being used for composting, but rather was being used to store bales of seed sacks eight-to ten-feet high. The report explained that, at the time of the inspection, OTC officials told the DNR that the sacks were being used as a bulking agent during the winter months and would continue to be stockpiled on the concrete pad throughout the winter. The report stated that the project permit did not allow "stockpiling of wastes for such periods of time," and that the storage violated Iowa Administrative Code rule 567–105.5(8). The report also stated that because the bags were not being stored in an enclosed building, OTC was also in violation of Iowa Administrative Code rule 567–104.9(1)(b) (1990). In conjunction with this finding, because OTC was no longer conducting composting on the concrete pad, ground permeability testing of those areas where OTC was actually composting was needed to ensure compliance with Iowa Administrative Code rule 567–105.5(8).

The report went on to note that, although annual tonnage had exceeded 30,000 tons, OTC had yet to build a covered building to handle the entire composting operation (except curing), as Phase III required. The report stated that the "[f]ailure to begin construction of the covered facility early in the next construction season would be a violation of the terms of the permit."

The report further noted that odor complaints had been received in the seven to ten days before the investigation and that the investigation revealed that ponded water at the facility was septic and responsible for generating considerable odor.

On December 22, OTC responded to the report and stated among other things that (1) the ponded area resulted from snow melting; (2) the requirement of permeability testing had not been raised before; (3) baled seed and feed bags are "salvageable material" rather than "solid waste" and were therefore only subject to the storage requirements of Iowa Administrative Code rule 567–104.9(2); and (4) although the comprehensive plan required a building when tonnage exceeded 30,000 tons per year, there was no advantage to such a building that would cost between $500,000 and $750,000 because the building could hamper operations.

Finally, OTC stated that it was aware of the concerns of the DNR and of the Prole facility's neighbors, but claimed that additional construction and improvements would not eliminate those concerns. Instead, OTC noted that (1) it had begun to seek an additional composting site elsewhere in Iowa; and (2) once this second facility was established, OTC would phase out much of the composting at the Prole facility.

As mentioned, before the transfer in ownership, OTC and the DNR were in settlement negotiations regarding Administrative Order 95–SW–17. Renfrow and Danley continued the negotiations. Once the two explained that they wished to move much of the Prole operation to another location, the DNR became more willing to settle the pending order. The DNR began to view the negotiations as an opportunity to develop a revised operating plan to replace the existing plan. Thereafter, OTC drafted a revised operating plan.

On February 9, 1996, the DNR responded to OTC's proposed operating plan. In responding to the plan, the DNR addressed the need for additional efforts to control potentially contaminated runoff from the south end of the composting area. OTC and the DNR thereafter exchanged correspondence relative to the proposed operating plan. The purpose of these negotiations was to devise an operating plan

that did not include a roofed building but at the same time would give protection to the environment.

On March 7, the DNR confirmed that the permeability testing of the Prole site met or exceeded the requirements of the Iowa Administrative Code.

On April 3 and May 31, the DNR inspected the Prole facility again and concluded OTC was not operating the facility in accordance with the permit, the operating plan, or the Iowa Administrative Code. Among other things, the inspection reports noted that Phase III of the original operating plan required an enclosed facility when the facility was processing 30,000 tons per year, and OTC exceeded such tonnage in the fall of 1995. The DNR provided OTC with a list of requirements and recommendations to bring the facility into compliance with the law.

On June 7, OTC submitted a second draft operating plan for the DNR to review. The plan did not include the construction of a covered facility. The plan, however, contained (1) limitations on the types of materials that would be accepted and (2) operating standards. The DNR agreed with the proposed plan as an interim plan based on the understanding that OTC would cease using the site for mixed solid waste by the end of March 1997.

On August 23, OTC informed the DNR that it intended to phase out its operations in Prole within two years by opening a compost facility in Hardin County, Iowa. In November OTC filed an application for a sanitary disposal permit in Hardin County.

The DNR conducted additional inspections of the Prole facility on September 16 and October 30. The DNR again concluded after these inspections that OTC was not operating the facility in accordance with its permit, the original operating plan, the interim operating plan, and the Iowa Administrative Code.

On November 15, 1996, the DNR issued Administrative Order Numbers 96–SW–19 and 96–WW–45 [hereinafter Administrative Order] to OTC, Tim Danley and Ken Renfrow. *See* Iowa Code §§ 455B.175(1), .307(2) (1995). The Administrative Order superseded the previous order—95–SW–17—the appeal of which had not yet been resolved. The Administrative Order stated that the DNR intended to (1) revoke OTC's sanitary disposal project permit as of January 1, 1997; (2) restrict OTC's composting operation to yard waste and direct OTC to move mixed compost material already on site; (3) require reduction of all yard waste by fifty percent by July 1, 1997; and (4) require complete elimination and removal of all remaining waste by January 1, 1998.

The Administrative Order also rejected OTC's previously submitted application for a composting permit in Hardin County. Finally, the Administrative Order assessed a $10,000 civil penalty. *See* Iowa Code §§ 455B.109(1), .307(3) (1995); Iowa Admin. Code r. 567–10 (1992).

The DNR inspected the Prole site on several occasions after the issuance of the Administrative Order. These inspection reports were incorporated into amendments to the Administrative Order. The inspections occurred on November 18, 1996; January 1997; and April 1997. The reports resulting from these inspections indicated violations similar to those mentioned in previous inspection reports and noted that OTC was not operating the facility in accordance with OTC's permit, the original operating plan, the interim operating plan, or the Iowa Administrative Code.

## II. Proceedings.

OTC appealed the Administrative Order. Following a contested case hearing, an ALJ entered a proposed decision. The ALJ affirmed the Administrative Order that imposed (1) a penalty against OTC, Danley, and Renfrow and (2) revoked OTC's sanitary disposal project permit, effective three months from the date of a

final administrative decision. The ALJ, however, reversed the denial of OTC's application for a new sanitary disposal project permit at the Hardin County site.

Following a hearing before the EPC, the commission affirmed the ALJ's decision and adopted it as the final agency decision. (Hereinafter, whenever we refer to the ALJ's findings, we mean the ALJ's findings as adopted by the EPC.) OTC then petitioned for judicial review in the district court.

The district court affirmed the decision of the EPC. OTC, Danley, and Renfrow thereafter appealed to this court. (Hereinafter, we refer to OTC, Danley, and Renfrow collectively as "OTC.") The DNR did not seek judicial review of the agency decision regarding the permit for the Hardin County site and has not appealed to this court.

### III. Scope of Review.

This case involves an appeal of a district court ruling on judicial review of (1) an administrative order issued under Iowa Code sections 455B.175(1) and 455B.307(2) and (2) an assessment of civil penalties under Iowa Code section 455B.109 and Iowa Administrative Code chapter 567–10 (1992). Iowa Code chapter 17A therefore governs our review. *See* Iowa Code §§ 455B.178, .308 (1999).

 A district court engaged in judicial review under Iowa Code section 17A.19(8) acts in an appellate capacity to correct errors of law on the part of the agency. *IBP, Inc. v. Al–Gharib*, 604 N.W.2d 621, 627 (Iowa 2000). The district court may affirm agency action or remand for further proceedings. Iowa Code § 17A.19(8). However, if the agency's actions prejudice substantial rights of the petitioner, the court shall reverse, modify, or grant any other appropriate relief. *Id.* When we review a district court's judicial review ruling, we apply the standards of section 17A.19(8) to the agency action to determine whether our conclusions are the

same as the district court's conclusions. *IBP*, 604 N.W.2d at 627.

 Because the present matter is a contested case, we must determine whether substantial evidence supports the agency's actions when we review the record made before the agency as a whole. Iowa Code § 17A.19(8)(f). We may not interfere with an agency finding when there is a conflict in the evidence or when reasonable minds might disagree about the inference to be drawn from the evidence. This is so whether or not the evidence is disputed. *Id.* Evidence is substantial when a reasonable mind could accept it as adequate to reach the same findings. *IBP*, 604 N.W.2d at 632. We apply agency findings broadly and liberally to uphold, rather than to defeat, an agency's decision. *Id.*

### IV. The Issues.

In this appeal we consider the following issues raised by OTC: (1) whether substantial evidence supports the findings of violations alleged in the Administrative Order, (2) whether substantial evidence supports the assessment of an administrative penalty, and (3) whether substantial evidence supports the revocation of OTC's sanitary disposal project permit.

### V. Background.

The provisions relating to solid waste disposal are found in Iowa Code sections 455B.301 through 455B.316 (1995). Iowa Code section 455B.301A declares the state policy on solid waste disposal:

The protection of the health, safety, and welfare of Iowans and the protection of the environment require the safe and sanitary disposal of solid wastes. An effective and efficient solid waste disposal program protects the environment and the public, and provides the most practical and beneficial use of the material and energy values of solid waste. While recognizing the continuing necessity for the existence of landfills, *alternative methods of managing solid waste*

*and a reduction in the reliance upon land disposal of solid waste are encouraged.*

(Emphasis added.) Composting is an alternative method of managing solid waste that reduces reliance upon land disposal of solid waste. It is therefore an activity that the legislature encourages.

Iowa Code section 455B.301(20) defines solid waste—for our purposes here—to include "garbage, refuse, rubbish, and other similar discarded solid or semisolid materials, including but not limited to such materials resulting from industrial, commercial, agricultural, and domestic activities."

To implement Iowa's sanitary disposal system, the EPC has authority to establish rules to govern the general operation and maintenance of sanitary waste disposal projects including the issuance of permits for such projects. *See* Iowa Code § 455B.304. Pursuant to such authority, the EPC has adopted administrative rules found in Iowa Administrative Code chapters 567–100 to –121.

> A "sanitary disposal project" includes
>
> all facilities and appurtenances including all real and personal property connected with such facilities, which are acquired, purchased, constructed, reconstructed, equipped, improved, extended, maintained, or operated to facilitate the final disposition of solid waste without creating a significant hazard to health or safety, and which are approved by the executive director [of the DNR].

Iowa Code § 455B.301(18).

The administrative rules require solid waste to be stored, collected, transported, utilized, processed, reclaimed or disposed of in a manner consistent with Iowa Administrative Code chapters 567–100 to –121. Iowa Admin. Code r. 567–101.1 (1990).

Any public or private agency must obtain a permit from the director of the DNR before operating a sanitary disposal project. Iowa Admin. Code r. 567–102.1 (1989); *see* Iowa Code § 455B.305. Before obtaining a permit, the agency must file with the director a comprehensive plan detailing how the agency will comply with the laws regarding solid waste disposal. Iowa Code § 455B.306. The director of the DNR may suspend or revoke the permit if a sanitary disposal project is found not to meet the requirements of the statutory law regarding solid waste disposal or the administrative rules issued under section 455B.304. Iowa Code § 455B.305(1).

All sanitary disposal projects must be constructed and operated in accordance with the plans and specifications as approved by the DNR and the terms of the permit. Iowa Admin. Code r. 567–102.5 (1989). The approved plans shall constitute a term of the permit. *Id.*

## VI. Violations.

Before addressing the alleged violations, we must first address OTC's contention that it is not subject to the former owners' operating plans approved by the DNR. OTC also contends that, even if it were subject to those plans, those plans were superseded by the interim operating plan submitted to the DNR on June 7, 1996.

The permit issued to OTC on April 25, 1994, stated that the Prole project would be operated according to plans and specifications already on file with and approved by the DNR. When Danley and Renfrow purchased OTC, the DNR amended and reissued the permit, listing them as the new responsible officials. However, the DNR made no other substantive changes to the permit.

As the cover letter accompanying the permit explained: "All of the technical and administrative requirements in the permit and Amendment #1 remain the same and the permit expiration date remains the same...." Furthermore, regulatory law specifically states that permit terms include all construction and operation plans and specifications approved by the DNR. *See* Iowa Admin. Code r. 567–102.5. There is no record evidence that the new

owners sought to amend the permit or otherwise formally objected to being subject to all of the terms of the permit as they existed under the previous owners. The district court therefore correctly affirmed the ALJ's conclusion that the new owners are subject to the former owners' operating plans and Amendment #1 to that plan.

As mentioned, OTC also contends that, even if it were subject to the previous owners' operating plan, the June 7, 1996 interim operating plan superseded the previous owners' operating plan. The district court also correctly affirmed the ALJ's rejection of this argument.

The ALJ found that (1) the DNR had never approved the plan OTC had submitted and (2) at best the interim operating plan was only temporary. There is substantial record evidence to support these findings. Communications from the DNR plainly show its understanding that the interim plan was to be followed only on a temporary basis.

However, the ALJ also found that the correspondence between OTC and the DNR could reasonably have led OTC to believe that the DNR had accepted the interim operating plan (even if only on a temporary basis) as of July 23, 1996. The ALJ therefore determined that OTC should not be penalized for any perceived violations of the original owners' operating plan (as amended) between July 23, 1996, and the issuance of the Administrative Order on November 15, 1996. Like the district court, we conclude that there was substantial evidence to support these findings.

We next address whether there was substantial evidence to establish the alleged violations.

■ **A. Water quality issues.** Iowa Code section 455B.186 as well as Iowa Administrative Code rule 567–64.3 (1992) prohibits the discharge of pollutants into waters of the state without first obtaining a permit from the director of the DNR.

Iowa Code section 455B.103A authorizes the issuance of general permits for storm water discharges. The DNR has adopted rules regarding permits for storm water discharge. *See* Iowa Admin. Code rs. 60.2, 64.3–64.16 (1992). Iowa Administrative Code rule 64.3(1) provides that no person shall operate any wastewater disposal system or part thereof without, or contrary to any condition of, an operation permit issued by the director of the DNR.

OTC's storm water permit provided OTC must develop and implement a "pollution prevention plan" for its Prole facility that includes best management practices to prevent and reduce the amount of pollutants in storm water runoff. The permit also required OTC to modify the plan to address deficiencies noted by the DNR. In addition, OTC's storm water permit required the company to properly maintain its facilities to provide a clean, orderly facility.

After the inspection of April 3, 1996, the DNR notified OTC that placement of curing piles less than 100 feet from the creek on the site violated a portion of its storm water pollution prevention plan by placing material outside the drainage contained by terraces and storm water ponds. In addition, OTC was directed to amend its storm water prevention plan to include an additional sampling location near the southwest portion of the site drains.

At the following inspection in May, the DNR reported that OTC had not moved the curing piles. Additionally, the DNR noted that ponded water, black and septic in appearance, was running off from the ponded area into the adjacent stream. The DNR also noted that other pools of ponded water, estimated at 500 to over 1000 gallons in size, were observed. Finally, the DNR noted that OTC had not modified its prevention plan as it had been directed to do.

In the Administrative Order, the DNR alleged that OTC violated its permit conditions, storm water discharge permit, and

the Iowa Administrative Code by (1) the May 1996 runoff, (2) the ponding of water at the site, (3) the storage of the curing piles near the stream without controls for runoff, and (4) its failure to modify the pollution prevention plan. The ALJ found that the preponderance of evidence supported the DNR's findings of violation. The district court upheld the ALJ's findings, and we agree with the district court.

### ■ B. Storage of seed bags.

Iowa Administrative Code rule 567–104.10(5) (1990) provides that solid waste shall not be stored at the composting facility site for more than seventy-two hours. The DNR alleged in the Administrative Order that OTC violated this rule by storing seed corn bags for more than seventy-two hours. The ALJ found the preponderance of the evidence supported this allegation and rejected OTC's contention that the bags constituted "salvageable material" and not solid waste. The district court found there was substantial evidence to support the ALJ's finding. We agree with the district court.

Iowa Administrative Code rule 567–100.2 (1997) follows the definition of solid waste found in Iowa Code section 455B.301: "garbage, refuse, rubbish, and other similar discarded or semisolid material, including but not limited to such materials resulting from industrial, commercial, agricultural, and domestic activities."

Iowa Administrative Code rule 567–100.2 defines salvageable material as "discarded material no longer of value for its original purpose but which has value if reclaimed." While there are regulations governing the storage of salvaged materials, there are no regulations governing how long such materials may be stored. See Iowa Admin. Code rs. 567–104.9(2), 104.10(5).

As the ALJ found, OTC told the DNR that it was storing the seed bags as bulking material for composting during winter months. Composting is the "controlled, biological decomposition of selected solid

organic waste materials under aerobic conditions resulting in an innocuous final product." Iowa Admin. Code r. 567–100.2. OTC's claim that it was storing the bags as salvaged material is inconsistent with its explanation that it would use the bags for composting. By definition, any product used in composting is solid waste. The seed bags were therefore solid waste subject to the storage requirements of regulation 567–104.10(5).

### ■ C. Composting base.

Iowa Administrative Code rules 567–105.5(8) through 105.5(11) (1989) relate to requirements for the base upon which composting takes place. Rule 567–105.5(8) requires that composting must take place on an impervious base that can support the load of the equipment used. The permeability coefficient of the base must be less than $1 \times 10^{-7}$ cm/sec (0.00028 ft/day).

Rule 567–105.5(9) provides that the base may be constructed of asphaltic cement concrete, Portland cement concrete, or similar materials able to support the equipment and load and meet the permeability coefficient.

Rule 567–105.5(10) requires that the low permeability, thickness, and continuity of the base material must be maintained.

Rule 567–105.5(11) requires that the area of the base must be adequate for the volume of solid waste being composted. Design calculations must be submitted supporting the proposed area of the base. These calculations should show support for equipment load and composting process used.

The DNR alleged in the Administrative Order that OTC had violated these regulations by not constructing the concrete composting pads. OTC asserts that under these regulations it was not required to compost on a concrete surface and that the ground underneath its composting area satisfies the permeability requirements.

There was testimony from the DNR that OTC was required to construct the impervious base as the rules require. Despite

this testimony, the ALJ found that beginning with its first inspection of the facility under the new owners the DNR was not insisting upon the construction of a concrete base. The ALJ interpreted the regulations as *permitting* but not *requiring* that the base be constructed of concrete. The ALJ noted that the only requirement of the regulations was that the base meet the permeability requirements and that it be able to support the load. Additionally, the ALJ found that test results showed that OTC met the permeability requirements.

However, the ALJ found a violation had occurred as the DNR had alleged in the Administrative Order. The ALJ gave two reasons. First, the permit conditions clearly require construction of concrete composting pads. For this reason, OTC was in violation of this condition of its permit. Second, there was testimony from both OTC and the DNR witnesses that the base often was not able to support the equipment load. There is substantial record evidence to support the ALJ's findings.

Like the district court, we think the ALJ was on solid ground in concluding there was a violation for the reasons it gave. The district court was therefore correct in upholding the ALJ's decision on this issue.

■ **D. Failure to construct facilities.** As mentioned, Phase II required OTC to construct a 60' × 80' covered facility for screening finished material before beginning to process 20,000 tons of yard waste and source-separated compostables annually. The permit amendment (#1) modified this requirement to allow OTC to build a 60' × 60' wet materials handling (blending) building and an "L"-shaped 90' × 90' concrete slab immediately· adjacent to the building.

OTC did construct the blending building, but the roof was destroyed by fire in September 1995, leaving only the walls and the floor intact. The DNR alleged in the Administrative Order that OTC's failure to reconstruct the roof was a violation of its permit. The ALJ agreed, finding that, as of the hearing date, OTC had failed to reconstruct the roof, although it had consistently been processing in excess of 20,000 tons of yard waste and source-separated compostables. We agree with the district court that there was substantial record evidence to support the violation finding.

As mentioned, Phase III of the plan required that, when OTC was processing up to 30,000 tons of yard waste and source-separated compostables, it had to construct a 60' × 360' covered facility. OTC was then to begin processing and composting materials in the covered facility. In order to process in excess of 30,000 tons per year, Phase IV required OTC to construct a 120' × 360' covered and partially enclosed composting facility.

The evidence shows that by November 1995 OTC was processing over 30,000 tons of waste annually, but OTC had not built the covered facility. There was therefore substantial evidence to support the ALJ's finding that this failure to construct the covered facility was a violation of the permit. The district court was correct in so concluding.

The evidence, however, also shows that on July 23, 1996, the DNR confirmed a new plan would be acceptable on an interim basis that would not require OTC to construct a covered facility. This was based on the understanding that OTC would cease using the facility for mixed solid waste by the end of March 1997. The ALJ found that, in these circumstances, OTC should not be penalized for perceived violations of the original operating plan between the dates of July 23, 1996, and November 15, 1996, the date of the Administrative Order. We agree with the district court that there was substantial evidence to support this finding also.

For all of the foregoing reasons, we conclude the district court correctly affirmed the ALJ's findings regarding OTC's

violations. We next consider whether the assessment of penalties for these violations was proper and whether the amounts assessed were appropriate.

### VII. Assessment of the Civil Penalty.

Iowa Code section 455B.109(1) provides:

> The commission shall establish, by rule, a schedule or range of civil penalties which may be administratively assessed. The schedule shall provide procedures and criteria for the administrative assessment of penalties of not more than ten thousand dollars for violations of this chapter or rules, permits or orders adopted or issued under this chapter.

Iowa Administrative Code chapter 567–10 (1992) implements Iowa Code section 455B.109.

When a violation has occurred, the administrator of the environmental protection division of the DNR is required to screen the case "to determine the most equitable and efficient means of redressing and abating the violation." Iowa Admin. Code r. 567–10.2; *see also* Iowa Code § 455B.109(2). In determining whether a violation may be appropriate for administrative assessment of penalties and in assessing such penalties, the DNR is to consider the following factors: (1) the costs saved or likely to be saved by the violator's noncompliance; (2) the gravity of the violation; (3) the degree of culpability of the violator; (4) the maximum penalty authorized for that particular violation under this chapter; (5) whether the assessment of administrative penalties appears to be the only or most appropriate way to deter future violations, either by the violator or by others similarly situated; and (6) other relevant factors that arise from the circumstances of the case. Iowa Code § 455B.109(1)(a)-(d); Iowa Admin. Code r. 567–10.2(1)–(6).

Here, the DNR assessed OTC $10,000 in civil penalties. The DNR estimated that OTC saved at least $4000 by its failure to properly handle solid wastes and runoff.

The DNR also determined that OTC's failure to comply with permit requirements saved time, operational costs, engineering costs, and construction costs easily exceeding $4000. The DNR therefore assessed OTC $4000 for the costs it saved for non-compliance. The DNR also assessed OTC $3000 for the gravity of the violation and $3000 for its degree of culpability.

The ALJ found that the DNR had sufficiently demonstrated that the violations called for the assessment of civil penalties and the amounts assessed were reasonable. The ALJ agreed with the DNR that OTC saved significant monetary and labor costs by its failure to comply with the permit conditions and the administrative rules. For example, the ALJ noted that OTC (1) had accepted large volumes of waste for which it received tipping fees without constructing improvements required by its permit and (2) failed to properly handle solid wastes and waste water runoff. By OTC's own estimate, the covered facility to house the composting operation would have cost between $500,000 and $750,000.

The ALJ also found that the penalties were appropriate and reasonable given the large number of repeated violations from the date the current owners purchased the corporation until the hearing. Finally, the ALJ found that the violations continued even after OTC was given notice of them along with directions that the violations be corrected.

The district court found there was substantial evidence to support the ALJ's findings, and we agree with the district court.

That brings us to the final issue.

### VIII. Revocation of OTC's Sanitary Disposal Permit.

In upholding the DNR's revocation of OTC's permit, the ALJ found:

> The current permit was issued based on the expectation and requirement that

these facility improvements would be constructed prior to certain waste loads being reached. OTC has reached those tonnage limits but has not constructed the additional facilities. When the current owners purchased the corporation from the former owners, they knew that an administrative order was pending and that they were subject to its terms. From its initial inspection reports, the DNR reiterated the requirement that additional facilities be constructed, in accordance with the terms of the permit and operating plans. The only time that the DNR has "retreated" from requiring the construction was when they thought OTC was committing to a firm schedule to phase out mixed waste composting at the Prole facility. Although OTC may have disagreed with the technical basis for this requirement, they have been unable to present an acceptable alternative. The DNR was legally entitled to require full compliance with the permit and to revoke the permit when it was clear that additional facilities would not be built.

The DNR has authority to "issue, revoke, suspend, modify, or deny permits for the construction and operation of sanitary disposal projects." Iowa Code § 455B.305(1). The DNR may revoke a permit if a sanitary disposal project does not meet the requirements of statutory law or administrative rule. *Id.* Additionally, OTC's sanitary disposal permit specifically states that failure to comply with Iowa Code chapter 455B or a rule or order promulgated pursuant thereto, or any or all provisions of the permit, may result in the revocation of the permit.

Substantial evidence supports the ALJ's finding that OTC failed to comply with the terms of (1) its original operating plan (as amended), and (2) its solid waste disposal permit, both of which required OTC to construct facilities to house its composting operation. Such failure alone was a sufficient ground to revoke the permit. However, by violating the terms of the permit, OTC also in turn violated the DNR's administrative rules. *See* Iowa Admin. Code r. 567–102.5 (stating that sanitary disposal projects must be constructed and operated pursuant to terms of the permit). Under Iowa Code section 455B.305(1), this was also a sufficient ground to revoke the permit. The district court was correct in concluding that there was substantial evidence to support the ALJ's decision upholding the revocation.

## IX. Disposition.

In sum, we agree with the district court that there was substantial evidence to support the ALJ's finding that (1) OTC had committed the violations alleged in the Administrative Order, (2) the imposition of the fine was appropriate, and (3) OTC's permit was properly revoked. We therefore affirm the district court decision.

Although we have not addressed all of the parties' contentions, we have considered them. Those we have not addressed were either not preserved for our review, are moot, or lack merit.

**AFFIRMED.**